UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

WETLANDS MITIGATION                                           CIVIL ACTION
STRATEGIES, LLC

VERSUS

WEYERHAEUSER NR COMPANY                         NO. 21-00256-BAJ-SDJ

RULING AND ORDER

Before the Court is Defendant Weyerhaeuser NR Company's **Motion To Dismiss Plaintiff's Amended Complaint (Doc. 25).** The Motion is opposed. (Doc. 28). Defendant filed a Reply Brief. (Doc. 30). For the reasons stated herein, Weyerhaeuser's Motion is **DENIED.**

I.      BACKGROUND

Plaintiff Wetlands Mitigation Strategies, LLC sued Defendant Weyerhaeuser NR Company for breach of contract, and alternatively, detrimental reliance. (Doc. 22, ¶¶ 47–70). Plaintiff also seeks declaratory relief. (Doc. 22, ¶¶ 71–74). Plaintiff's First Supplemental And Amended Complaint ("Amended Complaint") alleges the following.

Section 404 of The Clean Water Act, 33 U.S.C. § 1344, requires developers to obtain a permit to discharge dredge or fill material into waters of the United States. (Doc. 22, ¶ 5). The developer must obtain a permit from the U.S. Army Corps of Engineers ("USACE") to proceed with the project. (Doc. 22, ¶ 5). To offset wetlands loss, permit applicants may purchase wetland mitigation "credits" from commercial

1

"mitigation banks."[1] (Doc. 22, ¶ 5). These mitigation banks generally conduct one of several restoration projects and preserve the restored property in perpetuity. (Doc. 22, ¶ 5).

Defendant owns mitigation banks in Louisiana and other states. (Doc. 22, ¶ 6). Plaintiff provides services related to the mitigation banking business, including banks owned by Defendant.[2] (Doc. 22, ¶ 6). As part of the services provided, Plaintiff and Defendant entered into various contracts, as described below.

## A. The Gum Swamp/Dolly-T Contract—Contract A

The Gum Swamp/Dolly-T Contract ("Contract A") designated Plaintiff as Defendant's exclusive agent to market and sell mitigation credits from October 31, 2008 to October 14, 2015. (Doc. 22, ¶ 7). Contract A provides that Plaintiff will provide certain services to Defendant in exchange for fees and commissions. (Doc. 22, ¶ 8). Contract A contains provisions for the sale of existing mitigation credits and credits to be generated or created in the future. (Doc. 22, ¶ 10). Contract A also includes a fee schedule and terms for payment of services for sales made by Plaintiff. (Doc. 22, ¶ 10).

---

[1] A "mitigation bank" is defined as "a site, or suite of sites, where resources (e.g., wetlands, streams, riparian areas) are restored, established, enhanced, and/or preserved for the purpose of providing compensatory mitigation for impacts authorized" by permits issued by the Army Corps of Engineers. 33 C.F.R. § 332.2. "In general, a mitigation bank sells compensatory mitigation credits . . . ." *Id.*

[2] Under the terms of the contracts, Plaintiff agreed to negotiate the sale of credits with potential buyers, to consummate the sale of credits at closings, and to maintain an ongoing accounting of mitigation credits and funds from sales for each Mitigation Bank, among other related duties. *See* (Doc. 1-1, p. 1; Doc. 1-2, p. 1).

Pursuant to the terms of Contract A, Plaintiff has sold mitigation credits from approximately 988 acres in the Gum Swamp Mitigation Bank, approximately 365 acres from another Weyerhaeuser mitigation bank, and other mitigation credits and projects generating total proceeds in excess of $30 million for Defendant. (Doc. 22, ¶ 10).

Plaintiff alleges that Defendant breached Contract A in two ways. (Doc. 22, ¶¶ 48–54). First, Plaintiff contends that Defendant surreptitiously contracted with non-party Delta Land Services and/or Ecosystem Investment Partners ("Delta/EIP") to create a new mitigation bank (the "Pontchartrain Bank") to handle the sale of a subset of Defendant's mitigation credits, despite Plaintiff having been designated Defendant's "exclusive agent" for the marketing and sale of same. (Doc. 22, ¶¶ 25, 49). These certain mitigation credits relate to additional acreage that the parties refer to as "Addendum I." (Doc. 22, ¶ 15). Plaintiff contends that, pursuant to an "oral modification" of Contract A, it is entitled to a damages award based on the commission rates provided in Contract A for all past and future sales of mitigation credits regarding the Pontchartrain Bank, including the 2,817 acres of Addendum I identified in the Contract. (Doc. 22, ¶ 50).

Second, Plaintiff alleges that Contract A obligated Defendant to perform certain restoration work, which it failed to complete. (Doc. 22, ¶ 52). As a result, such mitigation credits were made unavailable for sale. (Doc. 22, ¶ 52). Plaintiff contends that but for this breach, the remaining credits would have been sold and Plaintiff would have earned commissions on the same. (Doc. 22, ¶ 53). Accordingly, Plaintiff

3

asserts that it is entitled to damages based on the commission rates provided in the Contract at the prices for which the mitigation credits could have been sold had Defendant performed the restoration work as agreed. (Doc, 22, ¶ 54).

## B. The Services Agreement—Contract B

Plaintiff and Defendant also entered into a Services Agreement ("Contract B") which addressed the sale of mitigation credits involving Permittee Responsible Mitigation Projects ("PRMs") and other mitigation projects in Louisiana. (Doc. 22, ¶ 37). Similar to Contract A, Contract B designates Plaintiff as Defendant's "exclusive agent" to market and sell the PRMs and other mitigation credits for specific projects.[3] (Doc. 22, ¶ 38). Contract B contains provisions for the sale of both existing mitigation credits and mitigation credits to be generated or created in the future. (Doc. 22, ¶ 39). Contract B also contains a fee schedule and terms for payment to Plaintiff for sales. (Doc. 22, ¶ 39). Contract B provides that Plaintiff may earn commissions even after Contract B expires if Plaintiff's significant work during the term led to a later sale. (Doc. 22, ¶ 39).

Plaintiff alleges that it is entitled to commissions for mitigation credit sales relating to work Plaintiff performed during the term of Contract B. Additionally, Plaintiff alleges that it performed significant work that resulted in at least one sale of mitigation credits after Contract B's term expired, for which Plaintiff should have received a commission. (Doc. 22, ¶ 57). Plaintiff alleges that Defendant's failure to

---

[3] Through Contract B, Plaintiff agreed to "(1) offer for sale and negotiate the sale of credits with potential buyers, (2) to consummate the sale of credits ('closings'), (3) to maintain an ongoing accounting of mitigation credits," and other related duties. (Doc. 1-2, p. 1).

4

pay Plaintiff a commission is a breach of contract, entitling Plaintiff to an award of damages based on both the sales price and the rates set forth in Contract B. (Doc. 22, ¶ 58).

### C. Detrimental Reliance

In the alternative, Plaintiff alleges that it is entitled to recover expenses for the losses it suffered due to having relied on Defendant's assurances that Plaintiff would be Defendant's exclusive agent for marketing and selling Defendant's mitigation credits. (Doc. 22, ¶¶ 60–70). Specifically, Plaintiff asserts that Defendant, through its employee Doug Hughes, represented that Plaintiff would be the exclusive agent to sell the Addendum I mitigation credits. (Doc. 22, ¶ 62). Plaintiff relied on those representations and performed substantial work in furtherance of marketing and selling the Addendum I mitigation credits. (Doc. 22, ¶¶ 63–64).

## II.  PROCEDURAL HISTORY

Plaintiff filed suit on May 5, 2021. (Doc. 1). In response, Defendant filed a Motion to Dismiss for Failure to State a Claim. (Doc. 4). Thereafter, Plaintiff filed an Amended Complaint. (Doc. 22). Defendant then moved to dismiss Plaintiff's Amended Complaint—the instant motion (Doc. 25). Based on Plaintiff's Amended Complaint, the Court terminated Defendant's initial Motion to Dismiss. (Doc. 39).

Plaintiff alleges that the Court has jurisdiction pursuant to 28 U.S.C. § 1332. (Doc. 22, ¶ 3). Where jurisdiction is founded on diversity, federal courts must apply the substantive law of the forum state. *Meadors v. D'Agostino*, No. 18-cv-01007, 2020 WL 1529367, at *3 (M.D. La. Mar. 30, 2020) (Jackson, J.) (citing *Erie R.R. v.*

5

*Tompkins,* 304 U.S. 64, 78 (1938)).

## III.   LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint against the legal standard set forth in Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft,* 556 U.S. at 679.

"[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly,* 550 U.S. at 556). Hence, the complaint need not set out "detailed factual allegations," but something "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" is required. *Twombly,* 550 U.S. at 555. When conducting its inquiry, the Court "accepts all well-pleaded facts as true and views those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club Inc.,* 599 F.3d 458, 461 (5th Cir. 2010) (quotation marks omitted).

## III.  DISCUSSION

### A. Standing

As an initial matter, Defendant asserts that Plaintiff does not have standing to bring this lawsuit because the damages it seeks are speculative and attenuated. (Doc. 25-1, p. 5). Specifically, Defendant contends that the chain of causation Plaintiff claims is conjectural because it involves an unpredictable chain of future events, which fails to satisfy the requisite "injury in fact" to confer standing in this matter. (Doc. 25-1, pp. 5–7).

Plaintiff responds that it seeks damages for lost commissions on *past* sales of mitigation credits—a concrete, unattenuated injury. (Doc. 22, ¶ 30). The Court agrees. At this stage in the litigation, the Court must accept Plaintiff's well-pleaded allegations as true. In doing so, the Court finds that Plaintiff has alleged a concrete injury sufficient to satisfy the "injury-in-fact" element of standing.

Defendant argues that this case is similar to *Little v. KPMG LLP* because the "chain of causation [Plaintiff] claims is both attenuated and conjectural." (Doc. 25-1, pp. 6–7). In *Little*, the United States Court of Appeals for the Fifth Circuit found that the alleged injury was too speculative to confer standing because it depended on several layers of decisions by third parties. Here, however, Defendant's argument fails.

To establish standing, a plaintiff must demonstrate (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) that is fairly traceable to the defendant's actions; and (3) that is likely to be redressed by a favorable

decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). At the pleading stage, allegations of injury are liberally construed. *See id.* at 561 ("[O]n a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim' [of standing]."). The Fifth Circuit has clarified that a "claim of injury generally is too conjectural or hypothetical to confer standing when the injury's existence depends on the decisions of third parties not before the court." *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976) ("[I]njury at the hands of a hospital is insufficient by itself to establish a case or controversy in the context of this suit, for no hospital is a defendant.")).

Here, liberally construing Plaintiff's allegations of injury and accepting Plaintiff's allegations as true, the Court finds that Plaintiff has alleged an injury sufficient to confer standing. Plaintiff seeks damages for past commissions that were allegedly unpaid in breach of the contracts entered into by Plaintiff and Defendant. (Doc. 22, ¶¶ 48–54). At this stage of the litigation, this alleged injury is sufficiently concrete to confer standing.[4]

## B. Breach of Contract

Defendant also asserts that Plaintiff's claims alleging breach of contract must be dismissed. (Doc. 25-1, pp. 8–12).

---

[4] Plaintiff also seeks damages for lost future sales of certain mitigation credits and for mitigation credits that "could have been sold" had Defendant performed certain work. While allegations of lost future sales alone may be insufficient to establish standing to bring this lawsuit, Plaintiff has sufficiently alleged a concrete injury in fact to confer standing.

### 1. *Breach Relating to Addendum I Mitigation Credits*

Defendant contends that Plaintiff has failed to articulate a modification to Contract A that would grant Plaintiff the "exclusive right" to sell certain mitigation credits related to the acreage of Addendum I. (Doc. 25-1, p. 8). Specifically, Defendant argues that the alleged oral modification to Contract A regarding the acreage of Addendum I—the root of Plaintiff's breach of contract claim—is illogical because, under Contract A, Plaintiff was already Defendant's exclusive agent for credits associated with that acreage. In other words, according to Defendant, there would be no need to modify Contact A to grant a right to credits associated with the Addendum I acreage. (Doc. 25-1, p. 8).

Accepting Plaintiff's well-pleaded allegations as true, the Court finds that Plaintiff has sufficiently alleged a breach of contract related to the Addendum I mitigation credits. Plaintiff relies on both Contract A and the parties' agreement regarding Addendum I to allege that Plaintiff was Defendant's exclusive agent for the marketing and sale of mitigation credits related to the acreage of Addendum I. (Doc. 22, ¶ 48). As the exclusive agent for the Addendum I mitigation credits, Plaintiff asserts that Defendant breached the agreements by secretly making Delta/EIP its agent for the sale of the Addendum I mitigation credits, and that Plaintiff is entitled to damages based on the commission rates outlined in Contract A for sales of the mitigation credits from the newly-created Pontchartrain Bank that included the Addendum I acreage (Doc. 22, ¶¶ 49–50).

Reading the allegations in the light most favorable to Plaintiff, the Court finds that Plaintiff may be entitled to damages for breach of contract based on its allegations that it was contractually the exclusive agent for the Addendum I mitigation credits and that Defendant violated that contractual agreement by secretly agreeing to allow Delta/EIP to market and sell the Addendum I mitigation credits.

*2. Encumbrances on Land*

Defendant next contends that Plaintiff's breach of contract claim fails because rights with respect to immovable property cannot contracted for, or modified, orally. (Doc. 25-1, pp. 9–10). Specifically, Defendant argues that the alleged oral modification to Contract A to include Addendum I is unenforceable because it relates to a conservation servitude, which is classified as a right of use in immovable property. (Doc. 25-1, p. 10).

Defendant points to the long-held "tenet of Louisiana law that contracts regarding the transfer or encumbrance of immovable property must be in writing." (Doc. 25-1, p. 10) (quoting *Pittman v. Pomeroy*, 552 So. 2d 983, 986 (La. App. 2 Cir. 1989)). Rights with respect to immovables are an exception to the general rule that Louisiana contracts can be modified orally. *Pittman*, 552 So. 2d at 986. Contracts for the transfer of rights of use, such as conservation servitudes, must be in writing. *Richard v. Hall*, 874 So. 2d 131, 145 (La. 2004).

Plaintiff responds that, while the agreement to include Addendum I was oral, it believed that the additional acreage was included in the scope of Contract A. (Doc.

10

22, ¶ 14). Further, Plaintiff asserts that Defendant did not grant Plaintiff authority to encumber, sell, or transfer immovable property as part of Contract A. (Doc. 22, ¶ 8). Plaintiff alleges that Contract A specified that Plaintiff would provide *services* to Defendant in exchange for fees and commissions. (Doc. 22, ¶ 8). Plaintiff contends that Contract A and the oral modification to Contract A did not permit a transfer of ownership of the property itself—merely for Plaintiff to perform services on behalf of Defendant.

Accepting Plaintiff's well-pleaded complaints as true, the Court finds that Plaintiff's claims do not fail at this stage of the litigation on the question of the enforceability of the oral modification. Plaintiff alleges that the addition of Addendum I fell within the scope of Contract A as originally contracted. (Doc. 22, ¶ 14). Defendant concedes, in a separate argument, that the addition of Addendum I to Contract A is not so much a modification as it is a logical outgrowth of the already-written Contract A. (Doc. 25-1, p. 8). Further, Plaintiff asserts that Contract A empowers Plaintiff to perform services, not to encumber, sell, or transfer immovable property. (Doc. 22, ¶ 8). If, as alleged, Plaintiff contracted to perform services, and not to transfer ownership of or interests in real property, such an oral agreement between the parties is not unenforceable, without further discovery, simply because it is oral.

### 3. *Expiration of Contract B*

Additionally, Defendant asserts that Contract B is now expired and cannot form the basis of a breach of contract claim. (Doc. 25-1, pp. 10–11). Further,

Defendant contends that Plaintiff has not sufficiently alleged "substantial work" to trigger payment required under Contract B. (Doc. 25-1, p. 11).

Plaintiff's Amended Complaint alleges that *during* the term of Contract B, Plaintiff performed significant work on a project that led to at least one sale of mitigation credits after the term of Contract B expired. (Doc. 22, ¶ 57). Plaintiff also contends that Contract B entitles Plaintiff to commissions of a project relating to significant work on that project performed during the term of Contract B. (Doc. 22, ¶ 56). These allegations are sufficient to survive Defendant's Motion to Dismiss.

### 4. No "Functional Equivalent of a Sale"

Defendant also asserts that Plaintiff's claim of a "functional equivalent of a sale" is ambiguous and lacks a factual foundation. (Doc. 25-1, p. 12). Defendant states that Plaintiff's "functional equivalent of a sale" allegation is confusing and "seems to imply" more than one possible factual basis—both of which Defendant argues are incorrect. (Doc. 25-1, p. 12). Defendant specifically argues that Plaintiff must either be alleging that (a) Defendant's agreement with Delta/EIP to serve as agent for the Pontchartrain Bank, which included the Addendum I acreage, constituted a sale of the physical property or (b) Defendant sold the business which holds the mitigation banks. (Doc. 25-1, p. 12). Defendant argues that it neither sold the property nor the business of the mitigation banks, and thus, Plaintiff's claim should be dismissed. (Doc. 25-1, p. 12).

The Court disagrees. Plaintiff does not allege that it is owed damages based on the sale of the actual property, the mitigation banks, or the business. The Amended

Complaint alleges that Defendant contracted to make Plaintiff its exclusive agent for the marketing and sale of mitigation credits, yet, thereafter, secretly agreed to make Delta/EIP its agent for the sale of those mitigation credits related to the Addendum I acreage, allowing Delta/EIP to earn past and future commissions that Plaintiff otherwise would have earned. (Doc. 22, ¶¶ 27, 29). Plaintiff contends that it is owed damages because Defendant agreed to allow Delta/EIP to serve as the agent for the Pontchartrain Bank, which included the Addendum I acreage that Plaintiff believed, based on Contract A and the oral modification, fell within the confines of its authority as exclusive agent under Contract A. (Doc. 22, ¶ 31). The Amended Complaint further alleges that Delta/EIP will now perform marketing and sales activities that Plaintiff would otherwise have performed related to the Addendum I acreage. (Doc. 22, ¶ 31). Construed in the light most favorable to the Plaintiff, these allegations state a plausible claim for breach of contract.

## C. Detrimental Reliance

Defendant also argues that Plaintiff's alternative claim of detrimental reliance must be dismissed. (Doc. 25-1, pp. 12–15). Specifically, Defendant states that Plaintiff has failed to establish the necessary elements of detrimental reliance. (Doc. 25-1, pp. 12–15).

Under Louisiana law, detrimental reliance is governed by Louisiana Civil Code article 1967. This Court has construed the Article to require that Plaintiffs prove, by a preponderance of the evidence, "(1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the

13

reliance." *Factor King, LLC v. Block Builders, LLC*, 193 F. Supp. 3d 651, 658 (M.D. La. 2016) (Jackson, J.) (granting in part and denying in part cross Motions for Summary Judgment).

Plaintiff asserts that Plaintiff and Defendant orally agreed that Plaintiff's duties as agent under Contract A would extend to the acreage in Addendum I. (Doc. 22, ¶ 60). Plaintiff also asserts that Plaintiff relied on Defendant's representations and undertook affirmative actions related to the new acreage, including assisting and refining the description of the mitigation work, preparing the Prospectus that Defendant submitted to the USACE, and communicating with the USACE on the project. (Doc. 22, ¶¶ 63–64). By doing so, Plaintiff refrained from seeking, obtaining, and performing other work. (Doc. 22, ¶¶ 65–66). Finally, Plaintiff argues that the reliance on Defendant's representations caused Plaintiff damages by foregoing other work in which Plaintiff could have earned fees and commissions and incurring cost and expenses. (Doc. 22, ¶ 69).

The Court finds that Plaintiff's allegations satisfy the necessary elements to survive the Motion to Dismiss. Regarding the first prong, Plaintiff alleges that there was an oral agreement between Plaintiff and Defendant. (Doc. 22, ¶ 60). Regarding the second prong, Plaintiff alleges that it relied on the representations of Defendant. Plaintiff took steps to perform work on behalf of Defendant related to the oral agreement between the parties. (Doc. 22, ¶¶ 63–64). Regarding the third prong, Plaintiff alleges that it suffered a detriment of position based on that reliance. Plaintiff did not seek, obtain, or perform other work while relying on the oral

14

agreement, incurred costs and expenses, and was unable to earn other fees and commissions. (Doc. 22, ¶¶ 65–66, 69).

Defendant also argues that reliance on an oral assurance is unreasonable as a matter of law. (Doc. 25-1, p. 14). Specifically, Defendant asserts that "reliance on extra-contractual representations has been found to be unreasonable as a matter of law when the representations were inconsistent with an unambiguous fully-integrated written contract." (Doc. 25-1, p. 14) (quoting *Caplan v. Ochsner Clinic, L.L.C.*, 799 F. Supp. 2d 648, 651 (E.D. La. 2011) (granting in part and denying in part Defendant's Motion for Summary Judgment)). Defendant also specifically claims that, because this was an oral contract to bind immovable property, reliance on an obligation that does not meet the legal formal requirements is per se unreasonable. (Doc. 25-1, p. 14).

The Court is not convinced. As indicated above, Plaintiff alleges that the oral agreement fell within the scope of the original Contract A. (Doc. 22, ¶ 14). And, again, Plaintiff has specifically alleged Contract A was *not* intended to allow Plaintiff to encumber, sell, or transfer immovable property, but was, instead, a contract for marketing and sales services. (Doc. 22, ¶ 8).

Further, while detrimental reliance claims are generally not favored under Louisiana law, *Thomas v. Wallace, Rush, Schmidt, Inc.*, No. CV 16-572-BAJ-RLB, 2019 WL 2617818, at *5 (M.D. La. June 26, 2019) (Jackson, J.), *appeal dismissed sub nom, Thomas v. Wallace, Rush, Schmidt, Inc., WRS*, No, 19-30658, 2019 WL 7905362

(5th Cir. Sept. 6, 2019), the issue of whether Plaintiff detrimentally relied on Defendant's representations is ripe for discovery at this stage of litigation.

Reading Plaintiff's allegations in a light most favorable to Plaintiff—which satisfy the necessary elements—Plaintiff's detrimental reliance claim will not be dismissed.

### D. Declaratory Relief

Finally, Defendant states that Plaintiff's third cause of action, calling for declaratory relief, should be dismissed. (Doc. 25-1, pp. 15–16). Under 28 U.S.C. § 2201, a party may seek a declaration from the Court, allowing the Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Defendant asserts that because Plaintiff's claims for declaratory relief are duplicative of its' breach of contract claims and that, if the Court were to dismiss Plaintiff's breach of contract claims, the Court could likewise dismiss the duplicate declaratory relief claims. (Doc. 25-1, pp. 15–16).

Again, the Court is unconvinced. Plaintiff has sufficiently alleged, at this stage of litigation, causes of action to survive Defendant's Motion to Dismiss. As the Court will not dismiss Plaintiff's breach of contract claims, the Court will similarly not dismiss Plaintiff's declaratory relief claims.

IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant Weyerhaeuser NR Company's **Motion To Dismiss Plaintiff's Amended Complaint (Doc. 25)** be and is hereby **DENIED.**

Baton Rouge, Louisiana, this 29th day of September, 2022

_____

JUDGE BRIAN A. JACKSON
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

17